### TURNER CONSTRUCTION CO., INC., Plaintiff,

v.

### The UNITED STATES, Defendant.

### No. 01–149 C.

United States Court of Federal Claims.

Nov. 13, 2002.

Herman Braude, Braude & Margulies, P.C., Washington, D.C., for plaintiff.

Glenn I. Chernigoff, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom were Bryant G. Snee, Assistant Director, David M. Cohen, Director, and Robert D. McCallum, Jr., Assistant Attorney General.

## OPINION

DAMICH, Chief Judge.

### I. Introduction

This case involves a claim of breach of contract, pursuant to the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, arising out of a contract for the construction of an addition to the VA Medical Center (VAMC) in Boston, Massachusetts. Pending before the Court are Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross–Motion for Summary Judgment. For the reasons stated below, Plaintiff's Motion is DENIED and Defendant's Motion is GRANTED.

### II. Background

On September 5, 1997, Plaintiff Turner Construction Co., Inc. (Turner), entered into a $24,436,000 contract ("Contract 1179") with the U.S. Department of Veterans Affairs (VA) for the construction of an ambulatory care addition to the VAMC in Boston. Plaintiff's complaint seeks $321,424 in damages, as a pass-through claim on behalf of its electrical subcontractor Richardson Electric Company (Richardson), for what it contends was an ordered change imposed by the VA Contracting Officer.[1]

The dispute centers on the extent and type of fire-rated protection required for feeder circuit wiring to, and panelboards in, the operating rooms (ORs) in the medical center addition. The VA maintains that the contract required 2–hour fire-rated protection for the emergency electrical system and that, pursuant to the contract specifications and the National Electrical Code (NEC), the feeders and panelboards in the ORs were part of the emergency system. The VA subsequently directed Turner and Richardson to

---

1. Pursuant to the Contract Disputes Act, Turner certified the pass-through claim to the VA on or about November 1, 1999, which was denied by the VA on March 20, 2000. This action followed.

effectuate the required fire protection via mineral-insulated (MI) cable. The legal dispute is two-fold: first, Turner disputes that the contract called for 2–hour fire-rated protection for the OR feeders and panelboards, arguing that the contract drawings evinced a clear intent otherwise. Second, as a paramount issue,[2] however, Turner argues that the contract specifications specifically reserved to the contractor the option of utilizing a 2–hour fire-rated conduit-and-wire "enclosure," instead of the substantially more expensive MI cable, for wiring the elements of the emergency electrical system. In directing the MI cable installation, Plaintiff avers, the VA materially altered the contract and is liable for the additional costs thereof.

Plaintiff is seeking summary judgment on the issue of liability and has reserved the issue of the quantum of damages for further argument.

### III. Discussion

This Court possesses jurisdiction over this action pursuant to the Contract Disputes Act and 28 U.S.C. § 1491(a)(1).

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A

material fact is one that might affect the outcome of the suit. *Id.* at 248, 106 S.Ct. 2505. A material fact is genuine if the evidence is such that a reasonable jury or trier of fact could return a verdict in favor of the non-moving party. *Id.* Initially, the moving party bears the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party can meet its burden by demonstrating the absence of issues of material fact or showing the absence of evidence to support the non-moving party's case. *Id.* If the moving party makes such a showing, the burden shifts to the non-moving party to present such evidence. *Id.* at 324, 106 S.Ct. 2548. The non-moving party must present a foundation for facts sufficient to support a verdict in its favor, with all reasonable inferences resolved in its favor. *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1047–48 (Fed.Cir.2000).

A. Contract 1179 Clearly Required 2–Hour Fire–Rated Protection for the Operating Room Feeders and Panelboards.

■ The contract as a whole consisted, *inter alia*, of the drawings, on which the Plaintiff almost exclusively relies, as well as the specifications.[3] The specifications, in turn, incorporated by reference the NEC[4]

**2.** Pl.'s Reply and Opp'n to Def.'s Mot. Summ. J. at 1.

**3.** Pl.'s Ex. 43, "Solicitation, Offer, and Award," ¶ 10, specifies that the "Scope of Work" shall include "General Construction as shown on the contract drawings and specifications ...." Contract specification 01010, "General Requirements," ¶ 1.1, "General Intention," part A, provides: "Contractor shall completely prepare site for building operations ... and perform work for Ambulatory Care Addition ... as required by drawings and specifications." Def.'s Cross–Mot. Summ. J.App. 1. Specification 16050, "Basic Methods and Requirements (Electrical)," ¶ 1.1, "Description," part A, provides: "Furnish and install electrical wiring, systems, equipment and accessories in accordance with the specifications and drawings." Def.'s Cross–Mot. Summ. J.App. 8.

**4.** Specification 16050, "Basic Methods and Requirements (Electrical)," ¶ 1.2, "Minimum Requirements," part A, provides: "References to

the National Electrical Code (NEC) ... are a minimum installation requirement standard." Part B provides: "Drawings and other specification sections shall govern in those instances where requirements are greater than those specified in NEC." Def.'s Cross–Mot. Summ. J.App. 8. Specification 16111, "Conduit Systems," ¶ 1.4, "Applicable Publications," provides: "The publication[s] listed below form a part of this specification to the extent referenced ... B. National Fire Protection Association (NFPA): 70 ..... National Electrical Code (NEC)." Def.'s Cross–Mot. Summ. J.App. 22. Specification 16111, ¶ 3.2, "Conduit Systems Installation, General," part A, provides: "Installation: In accordance with ... NEC, as shown, and as hereinafter specified." Def.'s Cross–Mot. Summ. J.App. 25. In addition, Drawing 1–E1 provides, in the legend, "General Notes," ¶ 1, that "All conduits and equipment shall be installed and grounded in accordance with the latest rules and regulations of the National Electrical Code and applicable local codes." Def.'s Cross–Mot. Summ. J.App. 66.

(and Massachusetts Electrical Code, for that matter) as well as various Federal Acquisition Regulations (FAR).[5] Plaintiff argues, however, that key drawings provided "plain proof of the written intentions of the contract designer" that the OR feeders and panelboards were not required to be fire protected. Pl.'s Mot. Summ. J. at 8. Contract interpretation, nevertheless, "begins with the plain language of the written agreement," *Hercules, Inc. v. United States,* 292 F.3d 1378, 1380 (Fed.Cir.2002), and the drawings are only one part of the contract. "The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to *all parts* of the contract." *Id.* at 1381 (emphasis added). Plaintiff further argues that there was no conflict between the drawings and the specifications, Pl.'s Mot. Summ.

J. at 10, or, alternatively, that the specificity of the drawings control over the general terms of the specifications, Pl.'s Mot. Summ. J. at 8–9, or that the contract was ambiguous and should be construed against the VA as the drafter of the contractual documents, Pl.'s Mot. Summ. J. at 16–17. As will be seen below, the contract was not ambiguous and 2–hour fire-rated protection of the OR panelboards and feeders is the only interpretation that gives meaning to all parts of the contract: drawings, specifications, and the NEC. *See Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991).

### 1. Contract 1179 Electrical Drawings

The Court will first address Plaintiff's reliance on the drawings of the contract.[6]

---

Moreover, Plaintiff's counsel acknowledged at oral argument on the motions for summary judgment that Contract 1179 incorporates the provision of the NEC:

THE COURT: "Do you believe that the National Electrical Code controls the specifications here?"

PLAINTIFF'S COUNSEL: "Yes. There is no problem about that." Tr. 5:6–9, August 13, 2002.

**5.** For example, FAR 52.236–21, "Specifications and Drawings for Construction," ¶ (a), provides, in pertinent part: "Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. *In case of difference between drawings and specifications, the specifications shall govern."* Def.'s Cross–Mot. Summ. J.App. 33 (emphasis added).

**6.** The Court is constrained here to note Plaintiff's counsel's puzzling characterization at oral argument of the manner in which contractors, and presumably his own client, approach contractual bidding and interpretation:

THE COURT: "I thought that the issue was: If there is a discrepancy between the specs and the drawing with regard to the emergency, with regard to the two-hour fire protection?"

PLAINTIFF'S COUNSEL: "When the bidder looked, he didn't notice it. It is not obvious. Instead, you [would] have to go in and do what the [VA] resident engineer did. In other words, read the spec, then read the definition, then read another definition: What is critical, what is emergency, what is essential and do that.

In the context of bidding, the average—and say on a job like this, you are looking at a spec book like this, you know, two to three inches and a set of drawings, several hundred. And you are ask-

ing the bidder for really—to be a mind reader. Can't do it . . . ." Tr. 8:5–19.

PLAINTIFF'S COUNSEL: "I think the bidders looked at the drawings . . . . I suppose a bidder has to give equal weight to both specs and drawings.

But, then again, the drawings give you the details and the details are what the builder is interested in . . . ." Tr. 10:11–16.

PLAINTIFF'S COUNSEL: "Large builders with a job this size hardly even look at some of the specs and drawings for this reason . . . . They have people who look at it but they hardly have people who flyspeck it this way. You really have to flyspeck these specs to come up with the Government's interpretation . . . ." Tr. 12:1–9.

PLAINTIFF'S COUNSEL: "[Y]ou are looking at builders, who, if you will, excuse the expression, they are not masters of English literature. They hardly read it. Sometimes they just skim it. If it doesn't jump out, they miss it." Tr. 14:17–20.

PLAINTIFF'S COUNSEL: "You have to understand how contractors bid. Contractors bid in an offer. First of all, when you bid, you are not sure you are going to get the job. So you may have to bid ten before you get one. And contractors do not stop and pause. They do not interpret specifications with a dictionary. They just read it as quickly and as easily as they can. They look at what the main parts are: Where's the big money? Where's the little money? What is the big feature in this thing? And they go into it. They are built to take risks." Tr. 30:14–23.

PLAINTIFF'S COUNSEL: "I doubt that Turner spent ten minutes on it. Remember, we are looking at a $24 million addition to a hospital. Hospitals have millions of different parts. They are incredibly complex buildings. They have all kinds of problems with them and you never know what you are going to run into. A bidder bids the thing. That is what he is in business to do

**392**

Drawing 1–E1,[7] titled "Electrical Symbol List," states, in the legend, "Branch Circuit Wiring Notes," ¶ 1, that "Wiring is shown on drawings only for specific routes or special conditions." In Drawing 1–E1, the "Electrical Panel Key" legend provides that "EP" stands for "Emergency Power," "CP" stands for "Critical Power," and "PP" stands for "Power Panel." In the same drawing's legend, "Raceways and Wiring," the hexagon symbol is described as "feeder tag—refer to legend of feeder *sizes*" (emphasis added). The legend for feeder sizes, in turn, is found on Drawing 1–E37.

On Drawing 1–E17,[8] "Electrical [-] Third Floor–North [-] Power and Signal Plan," the "General Notes" legend, ¶ 1, provides, "For symbols and notes, refer to Drawing 1–E1" and the "Circuitry Notes" legend, ¶ 1, provides, "All O.R. *critical branch* circuitry shall be from panels dedicated to the O.R.[,] i.e. Panels ORPP21A and ORPP21B are for O.R.1 equipment" (emphasis added). The clear inference to be drawn from the latter provision is that the operating room power panels ("ORPP") were to be considered "critical branch circuitry."

On Drawing 1–E37,[9] "Electrical *Emergency* Power Riser Diagram" (emphasis added), the panelboards at issue are designated "CPDN23" and "CPDS23." [10] These panelboards in turn feed eight panelboards each in the North and South operating rooms. They are designated ORPP21A, ORPP21B, ORPP22A, ORPP22B, ORPP23A, ORPP23B, ORPP24A, ORPP24B, ORPP25A, ORPP25B, ORPP26A, ORPP26B, ORPP27A, ORPP27B, ORPP28A, and ORPP28B. The wiring to these panels is accompanied by a hexagon 6 symbol. By reference to the "Critical Notes" legend on Drawing 1–E17, it is clear that these panelboards also were to be considered "critical branch circuitry." In addition, the "General Notes" legend on Drawing 1–E37, ¶ 1, provides, "For symbol and general drawing notes, refer to Drawing 1–E1" and ¶ 3 therein provides, "Refer to distribution panel

and panelboard schedules for panel *sizes* and associated wiring" (emphasis added). That same drawing's "Legend of Feeder *Sizes*" (emphasis added) establishes that the hexagon 6 symbol signifies "4# 1 and 1# 8g" conductors and a "raceway *size* conduit" of 1 ½ inches (emphasis added).

The last drawing of direct significance to the wiring of the OR panelboards and feeders is Drawing 1–E42.[11] It is entitled, "Electrical Normal and Emergency Distribution Panel Schedules." Its "Distribution Panel Schedule" for "CPDN23" and "CPDS23" shows that the hexagon 6 "Feeder *Size*" (emphasis added) applies to the ORPP21–28 A and B panels.

These drawings themselves therefore establish that: (1) the conduit wiring indicated refers to wiring *size,* not fire protection requirements; (2) the panelboards in question and their feeder wiring were part of the *critical branch circuitry* of the *emergency* electrical system; and (3) the provisions of the NEC governed the installation of all electrical circuits.

### 2. National Electrical Code

Article 517 of the NEC, "Health Care Facilities," provides the definitions of "Critical Branch," "Emergency Systems," and "Essential Electrical System."

"Critical Branch" is defined as:

A subsystem of the emergency system consisting of feeders and branch circuits supplying energy to task illumination, special power circuits, and selected receptacles serving areas and functions related to patient care, and which are connected to alternate power sources by one or more transfer switches during interruption of the normal power source.

NEC, Article 517–3; Def.'s Reply in Support of Cross–Mot. Summ. J. at 87.

"Emergency System" is defined as:

A system of feeders and branch circuits meeting the requirements of Article 700,

---

and he takes a risk." Tr. 31:9–16, August 13, 2002.

**7.** Def.'s Cross–Mot. Summ. J.App. 66.

**8.** Def.'s Cross–Mot. Summ. J.App. 67.

**9.** Pl.'s Ex. 41.

**10.** "CPD" stands for "Critical Power Distribution."

**11.** Pl.'s Ex. 42.

and intended to supply alternate power to a limited number of prescribed functions vital to the protection of life and patient safety, with automatic restoration of electrical power within 10 seconds of interruption.

*Id.*

"Essential Electrical System" is defined as:

A system comprised of alternate sources of power and all connected distribution systems and ancillary equipment, designed to ensure continuity of electrical power to designated areas and functions of a health care facility during disruption of normal power sources, and also designed to minimize disruption within the internal wiring system.

*Id.*

These NEC definitions, together with the drawings and specifications, demonstrate that the operating room panelboards and feeders were part of the emergency electrical system. The panelboards were set up to have two potential sources of power, one commercial and the other emergency; the feeders provided the alternate emergency power.[12]

### 3. Specifications

Having established that the OR panelboards and feeders were part of the emergency electrical system, Contract 1179 is equally clear that the panelboards and feeders therefore had to have 2–hour fire-rated protection. Specification 16111, "Conduit Systems," ¶ 3.2, "Conduit Systems Installation, General," Part B, provides: "Essential (Emergency) raceway systems: Install entirely independent of other raceway systems. Essential raceway systems shall be either in a rated and approved two (2) hour enclosure or the raceway shall be two (2) hour rated e.g., MI cable."[13]

Plaintiff, however, argues that, by negative inference, Drawings 1–E37 and 1–E42 demonstrate that 2–hour fire-rated protection was not intended for the OR panelboards and feeders. Drawing 1–E37, " Electrical Emergency Power Riser Diagram," has an explicit note that the *penthouse* emergency feeders are required to change from simple conduit and wire to MI cable prior to penetrating the third floor (containing the ORs). Because the penthouse feeder requirement of MI cable was explicit, Plaintiff reasons, the lack of such a specific requirement for the OR feeders (in Drawings 1–E37 and 1–E42) was properly construed by Plaintiff and its electrical contractor as signifying mere conduit-and-wire feeders, without the 2–hour fire-rated protection.[14]

Plaintiff's conclusion that the OR panelboards and feeders did not require 2–hour fire-rated protection is short-sighted and based on a tunnel-vision concept of contract interpretation. Plaintiff ignores that the penthouse wiring transition through the OR third-floor was evidently a "special condition" (as addressed in Drawing 1–E1); that conduit-and-wire designations were ones indicating wiring size (as addressed in Drawings 1–E1 and 1–E37), not fire protection requirements; that, pursuant to Specification 16111, 2–hour fire-rated protection could be accomplished *either* by MI cable or within a 2–hour rated and approved "enclosure"; and that therefore the drawings' references to conduit and wire did not preclude 2–hour fire protection, so long as the conduit-and-wire option was within an approved enclosure.[15]

Based on Plaintiff's patent misreading of the contract's terms, Plaintiff would thus have the Court apply, to the supposed detri-

---

12. Def.'s App. 63.

13. Def.'s App. 25.

14. See Pl.'s Ex. 11, Letter from Richardson to Turner, September 4, 1998: "While drawing 1–E37 shows the penthouse emergency equipment feeders changing from conduit and wire to MI cable it does not specify this for the Operating Room panels. Richardson Electrical considers these panels to be a part of the Operating Room equipment and as such we will be installing conduit and wire as identified on drawing 1–E42."

15. See Pl.'s Ex. 22, Richardson Letter to Turner, January 18, 1999: "The drawings depict the installation of a conduit and wire based system for the distribution of the *emergency* feeders on the third floor. The specification call[s] for Turner to enclose that conduit system in a fire-rated *enclosure* (16050—1.22.B)" (emphases added).

ment of Defendant's case, established rules of contract interpretation that specific terms govern over general terms, that the law prefers to interpret a contract to give reasonable meaning to all parts of the contract over one part that would otherwise make the contract meaningless or superfluous, that a contract susceptible of more than one interpretation is ambiguous, and that a latent ambiguity in a contract should be construed against the drafter. These principles are sound, but inapplicable here. The Court finds no conflict between specific and general terms in the contract, nor any ambiguity, on the question of whether the contract calls for 2–hour fire-rated protection for the OR panelboards and feeders.

As a final argument, Plaintiff argues that 2–hour fire-rated protection for the OR panelboards and feeders is inconsistent with the contract's architectural drawings that prescribed non–2–hour fire-rated walls surrounding the ORs, and that this inconsistency further sustains Plaintiff's reading of the designer's intent. Not only is Defendant's explanation plausible—that the purpose of the fire protection of the wiring and panels was to protect against an outbreak of fire elsewhere in the VAMC that might otherwise jeopardize the flow of critical power during an operation—but the government is clearly entitled to its own judgment as to the emergency needs of the medical center and to insist upon full compliance with its contract specifications, whether or not the Plaintiff— or the Court—would have designed the medical center differently. See *Farwell Co. v. United States*, 137 Ct.Cl. 832, 836, 148 F.Supp. 947 (1957); *H.L.C. & Associates Const. Co. v. United States*, 176 Ct.Cl. 285, 306, 367 F.2d 586 (1966); *Elastomeric Roofing Associates, Inc. v. United States*, 26 Cl. Ct. 1106, 1114 (1992).

Defendant is thus entitled to summary judgment that Contract 1179 called for 2–hour fire-rated protection for the OR panelboards and feeders.

**B. The VA Was Entitled to Mandate MI Cable When It Became the Only Option Feasible to Provide 2–Hour Fire-Rated Protection.**

Plaintiff's complaint alleges that, when the VA finally ordered the installation of MI cable, its "elimination of one of [the] two authorized performance options was a constructive change." [16] In support, Plaintiff argues variously that: 1) there was in fact "sufficient space for the use of a fire-rated enclosure and that there were a number of alternative fire-rated enclosures of lesser expense which could have been used, had the government permitted Turner and Richardson the opportunity to explore the matter ....."; [17] and 2) if the prospective space for conduit-and-wire enclosure had indeed become too congested "in coordination with the other MEP trades," [18] then the fact of such over-congestion at that time demonstrates a defect in the specifications, in which case the government breached its implied warranty of satisfactory performance.

Defendant argues for summary judgment on its behalf that Plaintiff bore the risk that the less expensive method of fire-rated protection would become no longer feasible and that Plaintiff's failure to coordinate the work of its subcontractors caused the loss of feasibility of the conduit-and-wire enclosure option. Once the conduit-and-wire option was foreclosed, the VA was within its rights under the contract to insist on the only remaining option for performance of the fire rating requirement.

Plaintiff's claim that the VA arbitrarily deprived it of a contractual option requires a recitation of the course of events that led to the Government's insistence that Plaintiff utilize MI cable for wiring the feeders to the Operating Room panelboards. The chronology is important because, although Specification 16111 reserved to Turner the option of either a 2–hour rated "enclosure" or the MI cable (itself 2–hour rated and thus not requiring a fire-rated "enclosure"), Turner's failure to act in sufficient time led to a consensus of the parties that the conduit-and-

---

**16.** Pl.'s Mot. Summ. J. at 25.

**17.** *Id.* at 23.

**18.** Pl.'s Ex. 30.

wire enclosure option was no longer feasible. It was only after this consensus was reached that the VA ordered the installation of MI cable, admittedly the more expensive of the options for ensuring the appropriate fire rating for the panelboard feeders.

### 1. Chronology

In July of 1998, the VA sought, and Turner agreed to, the relocation of the operating room electrical panels (the panelboards in question) from the hallways outside the ORs to within the ORs themselves.[19] Richardson informed Turner that the change was feasible and required no additional cost.[20] Turner advised the VA that it agreed to the change at no extra cost.[21]

During the course of consideration of this change, Turner raised a question with the VA about the fire rating requirement of the OR electrical feeders.[22] The VA senior resident engineer replied in writing on August 12, 1998, that, pursuant to Specification 16050, ¶ 1.22, the feeders required 2-hour fire-rated protection and that "You [Turner] have the option to provide a two hour rated enclosure or use 2 hour fire-rated MI cable."[23] Richardson disagreed with the VA's interpretation that the contract required 2-hour fire-rated protection of the feeders and panelboards and sought Turner's assistance in re-questioning the VA;[24] Turner submitted a Request for Information (RFI # 196) on the matter, adding its concurrence with Richardson's position on the issue;[25] the VA persisted in its interpretation of the contract requirements;[26] and, on November 30, 1998, Richardson informed Turner that it would "install the panels as directed by RFI # 196 even though this will be in violation of the specifications and the Mass. State Code."[27] Significantly, at least through this point in the dispute, neither Turner nor Richardson had expressed the position that a 2-hour fire-

rated conduit-and-wire enclosure was impossible by design. On the contrary, Richardson's November 30, 1998, letter to Turner that it would install the panels (and, by implication, the feeders) as directed by the VA's response to RFI # 196 (albeit under protest) fairly suggests that there was no consideration of design error.[28]

On January 14, 1999, Turner wrote to Richardson and requested that Richardson proceed with the installation of MI cable:

> On December 8, 1998 during an on site meeting with the VA Resident Engineers, Architect (Payette Associates), and MEP consultant (BR + A), it was determined that *the only viable means* of accomplishing the *required* fire rating for the operating room feeders at the third floor was to use MI cable. This decision was based on a review of the coordination drawings and a *consensus* that *the available space was too congested for any other means of meeting the rating requirement.*

Pl.'s Ex. 21 (emphases added).

This December 8, 1998, meeting was further referenced in a later letter that Turner sent to the VA senior resident engineer on June 22, 1999 (seeking the VA's issuance of a change order approving additional payment to Turner to account for the cost of the MI cable installation):

> On December 8, 1998 a special meeting was held at the jobsite attended by yourself, [the] VA Resident Engineer, representatives from your Mechanical A/E consulting firm, BR + A, Turner *and our MEP subcontractors* to discuss the genuine difficulty of coordinating the third floor Operating Room emergency feeders. Our electrical subcontractor, Richardson Electrical, was attempting to coordinate conduit & wire within a two (2) hour rated enclosure to meet the *requirements* of Specification

19. Pl.'s Ex. 4.

20. Pl.'s Ex. 6.

21. Pl.'s Ex. 8.

22. Pl.'s Ex. 10.

23. *Id.*

24. Pl.'s Exs. 11, 12, 13, 16.

25. Pl.'s Exs. 17, 19.

26. Pl.'s Exs. 17, 18.

27. See Pl.'s Ex. 20.

28. *Id.*

Section 16050–1.22–C. Unfortunately, our efforts to find *proper space* and *routing* for these components *in coordination with the other MEP trades* within *the very congested interstitial space* were proving fruitless . . . .

After extensive discussion it was determined that installing conduit & wire feeders within two (2) hour rated enclosures was *not feasible* and that *the only logical means* of providing two (2) hour rated feeders to the O.R. panels was by the use of MI–Cable in accordance with option listed under Specification Section 16050–1.22–E.

Pl.'s Ex. 30 (emphases added).[29]

The change order that Turner proposed in this letter described the change as "due to significant congestion of MEP systems within the interstitial space throughout the third floor level." *Id.*

Even Richardson acknowledged that the conduit-and-wire enclosure option had proven impossible. On January 18, 1999, Richardson responded to Turner's January 14, 1999, "request" that Richardson install the MI cable:

Richardson does not dispute the concurrence *of all parties* at the December 8, 1998 meeting. We would however expand on it. The drawings depict the installation of a conduit and wire based system for the distribution of the *emergency feeders* on the third floor. *The specification call[s] for Turner to enclose that conduit system in a fire rated enclosure* (16050—1.2.B), after Richardson tells you where the conduits are routed. The congestion above the third floor ceiling is such that the drawing specified installation, of conduit and wire, appears to be impossible.

Pl.'s Ex. 22 (emphases added).

Richardson's letter then made the first reference (and only reference until oral argu-

ment) to a possible design flaw. After citing the congestion in the third floor ceiling, Richardson noted,

Along with this, there is no detail on any contract drawing that would tell Turner how to build a horizontal "2–hour" fire rated enclosure. Joe [DeChirico, Turner's Project Superintendent], you told us that to your knowledge no UL approved horizontal "2–hour" fire rated enclosure exists. This in and of itself would prohibit the drawings['] specified conduit and wire installation.

*Id.*

On March 3, 1999, the VA made its determination that 2–hour fire-rated protection was contractually required for the OR feeders and panelboards, directed the installation of MI cable, and concluded that the MI cable and panelboard protection did not constitute grounds for a contract modification.[30]

2. Conduit–and–Wire Enclosure Was No Longer Feasible When the VA Mandated MI Cable Installation.

Plaintiff's argument [31] that there was still space for the conduit-and-wire enclosure option is belied entirely by the abundance of references in the contemporaneous correspondence to the contrary. The consensus of the attendees at the December 8, 1998, meeting, which included Plaintiff and probably included Richardson, and attested to by both Turner and Richardson, was that the available space was "too congested" and that MI cable was the "only viable means of accomplishing the required fire rating . . . ." [32]

In its reply brief and related exhibits, Plaintiff reveals that the conduit-and-wire "enclosure" it alleges was still feasible con-

---

**29.** Turner's letter of June 22, 1999, suggests that Richardson was a party to the December 8, 1998, meeting at which a "consensus" was obtained that the available space was "too congested" for a conduit-and-wire fire-rated "enclosure." "MEP" in the letter refers to mechanical, electrical, and plumbing.

**30.** Pl.'s Ex. 25.

**31.** Plaintiff's argument that there *was* sufficient space for the conduit-and-wire enclosure is repeated in Pl.'s Reply and Opp'n to Def.'s Mot. Partial [sic] Summ. J. at 4: "[T]he proof will show that there was more than enough space for the use of a fire-rated enclosure and that there were a number of alternatives to accomplish exactly that."

**32.** Pl.'s Exs. 21, 22, 30.

sisted of fire protective *paint or foam.*[33] Plaintiff's argumentation in this respect is contradictory, convoluted, and feeble. If there was still sufficient physical space and routing for conduit and wire feeders, that space could hardly have been precluded by enclosing them in paint or foam. Nevertheless, Plaintiff wrote the VA senior resident engineer in June 1999 that "our efforts to find proper space and routing for these components in coordination with the other MEP trades within the very congested interstitial space were proving fruitless."[34] Further, the contemporaneous correspondence reflects Turner and Richardson's understanding that "enclosure" meant a physical object more substantial than paint or foam. As previously cited, in Richardson's response on January 18, 1999, to Turner's request that Richardson install MI cable, Richardson complained of the lack of any detail in the contract drawings that "would tell Turner how to *build* a horizontal '2–hour' fire rated enclosure."[35] In an additional response to Turner's request that Richardson install MI cable, Richardson wrote Turner on January 26, 1999, emphasizing the NEC's provision that "the wiring of the Emergency System of a hospital shall be *mechanically* protected by installation in non-flexible Metal Raceways" as an alternative to MI cable.[36]

Thus, there is no genuine issue whether the conduit-and-wire enclosure option was physically precluded when, on March 3, 1999, the VA ordered Turner to install MI cable to meet the 2–hour fire-rated protection requirement for the OR feeders.

### 3. There is No Evidence that the Conduit–and–Wire Enclosure Option Was a Design Flaw.

■ The only legitimate question is whether the conduit-and-wire enclosure option was a design flaw. It would not matter

when the parties actually determined that conduit and wire was not feasible if the conduit-and-wire enclosure option for providing the requisite fire-rated protection was impossible by design *ab initio.* Unfortunately, Plaintiff has failed to allege or present evidence of such a design failure, merely arguing, in the alternative, that the lack of physical space for the conduit-and-wire enclosure option—*at the time the VA mandated MI cable installation*[37]—breached the Government's implied warranty of satisfactory performance pursuant to the doctrine of *United States v. Spearin,* 248 U.S. 132, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918). According to the Federal Circuit,

> Under the *Spearin* doctrine, when the government provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover costs proximately flowing from the breach.

*Franklin Pavkov Constr. Co. v. Roche,* 279 F.3d 989, 994–95 (Fed.Cir.2002).

Defendant argues, however, that the *Spearin* doctrine is not applicable here because the specifications were not defective and that Turner merely misinterpreted the contractual requirement for fire protection for the emergency feeders until MI cable became the only feasible method of the two options.

■ Moreover, Defendant argues that the implied warranty of satisfactory performance under *Spearin* only applies to design specifications,[38] whereas the fire protection options under Contract 1179 were performance specifications. The critical distinction between the two is based on the extent of any discretion allowed the contractor to achieve a specified objective.

---

**33.** Pl.'s Reply and Opp'n to Def.'s Mot. Partial [sic] Summ. J. at 12; Pl.'s Obj'ns to Def.'s Proposed Fact Findings for its Cross–Mot., Exs. 49, 50.

**34.** Pl.'s Ex. 30.

**35.** Pl.'s Ex. 22 (emphasis added).

**36.** Pl.'s Ex. 23 (emphasis added).

**37.** Pl.'s Mot. Summ. J. at 26: "Thus, when the government *later* limits or prohibits the contractor from the use of one of the optional methods, that action constructively changes the contract . . . ." (emphasis added).

**38.** *White v. Edsall Constr. Co., Inc.,* 296 F.3d 1081, 1084 (Fed.Cir.2002).

Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results. Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced.

*Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir.1987) (citations omitted).

The Federal Circuit has elaborated on the distinction. Performance specifications:

"set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." ... Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is "required to follow them as one would a road map."

*Blake Constr. Co., Inc. v. United States,* 987 F.2d 743, 745 (Fed.Cir.1993) (quoting *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 412 F.2d 1360, 1362 (1969)). While contract specifications may possess both design and performance characteristics, the key inquiry is the extent of the discretion afforded the contractor. *Id.* at 746. The greater the discretion, the more the specifications are construed as performance measures. Defendant here cites *Blake* to support its position that the fire rating requirements were performance specifications. In Blake, however, even where the contract specifically allowed the contractor considerable discretion to align its electrical conduits to avoid conflict with other construction trades, the Court

construed the contractor's underground alignment as breaching a design specification and held the plaintiff to an overhead alignment as generally depicted on contract drawings.

■ Similarly, although the specifications provided Turner two options to accomplish the fire rating of the emergency electrical system—conduit-and-wire enclosure or MI cable—that quite limited discretion, although hardly a precise "road map" that permitted no deviations, it certainly suggests that Turner was not allowed unrestricted latitude to exercise its "ingenuity" to accomplish the objective of 2–hour fire protection. That is why, for example, the VA first advised Turner in August of 1998 that "You have the option to provide a two hour rated enclosure *or* use 2 hour fire rated MI cable." [39] In allowing Plaintiff two, but only two, alternate routes to achieve the emergency protection feature, the contract specification for fire protection—Specification 16111, ¶ 3.2.B—is much closer to a design, rather than a performance, specification. [40]

The Court thus finds that the fire rating provision of Contract 1179 as it applies to the OR feeders and panelboards is a design specification. As a design specification, therefore, the contract impliedly warrants that satisfactory performance of the fire rating requirement could be achieved by either conduit-and-wire enclosure or MI cable.

■ Despite this finding, Plaintiff has made no claim, and offered no evidence, that the conduit-and-wire enclosure option could not, by design, have been employed satisfactorily to protect the OR feeders. Only in one paragraph in one of Plaintiff's exhibits is there any such suggestion, [41] but that reference stands otherwise alone, is both vague and unsupported, and is not cited in any of

---

**39.** Pl.'s Ex. 10 (emphasis added).

**40.** Defendant cites to *Penguin Industries, Inc. v. United States,* 209 Ct.Cl. 121, 530 F.2d 934, 937 (1976) for the proposition that the mere provision of some details in a manufacturing specification does not necessarily suffice to convert a performance specification into a design specification. The facts in *Penguin Industries* are not apropos. There the contract was entirely silent

on the methodology to be employed to glue a flash tube assembly into ignition cartridges, allowing the contractor to employ "its own judgment, experience and knowhow." Contract 1179, by contrast, was anything but silent as to the mechanisms prescribed to achieve the fire protection objective.

**41.** Pl.'s Ex. 22.

Plaintiff's briefs in support of its motion for summary judgment nor in opposition to Defendant's motion for summary judgment. Although Plaintiff's counsel, responding to inquiries from the Court at oral argument, made two *tentative* suggestions of design defect,[42] oral argument by itself is not evidence and will not suffice to create issues of fact defeating an otherwise valid motion for summary judgment. *Smith v. Mack Trucks, Inc.,* 505 F.2d 1248, 1249 (9th Cir.1974); see also *Laningham v. United States,* 2 Cl.Ct. 535, 554 n. 22 (1983).

Furthermore, even if Plaintiff's complaint could be construed as an allegation that the conduit-and-wire enclosure option was a design flaw from the beginning of the contract, the VA's implied warranty does not eliminate the contractor's obligation to have inquired about such an obvious mistake at the time. *Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 346 F.2d 962, 972–73 (1965).

4. Plaintiff Assumed the Risk that MI Cable Would Become the Only Feasible Option for 2–Hour Fire–Rated Protection of the OR Feeders.

█ Contract 1170 was a fixed-price contract. As general contractor, Turner had the obligation to ensure that the work was performed according to the drawings and specifications. It was also Turner's risk that the costs of the job might prove greater than anticipated. "In essence, as contractors must when they bid fixed-price work, [the contractor takes] a certain amount of risk by submitting a bid and ultimately entering into the contract on the basis of the information before it." *Franklin Pavkov,* 279 F.3d at 995.

The contract required Turner to "[c]oordinate location of equipment and conduit with other trades to minimize interferences"[43] and further specified, "The contractor shall also be responsible for coordination of the work of the trades, subcontractors, and material suppliers."[44] As the Court has held, *supra,* the contract's requirement for 2–hour fire-rated protection for the OR feeders and panelboards was clear; Plaintiff misread its obligation to provide such protection. It was Plaintiff and its subcontractor Richardson that continued to dispute the VA's interpretation, first proffered in August 1998, of the fire protection requirement. In addition, given Turner's and Richardson's contemporaneous accounts[45] of the December 8, 1998, meeting that described the "consensus" "of all parties" that there was only space left for the MI cable installation because of "very congested interstitial space" "in coordination with the other MEP trades," it is clear that Turner must shoulder responsibility for the fact that MI cable was the only remaining option for fire protection under the contract.

In its March 3, 1999, letter directing installation of MI cable, the VA did not "revoke" the conduit-and-wire enclosure option. It did not order a "change" in the contract, but rather directed that the contractor proceed under the terms of the contract.

IV. **Conclusion**

Defendant has met the burden on its cross-motion for summary judgment of showing an

---

42. THE COURT: "What you are saying is that from the very beginning, as soon as the change was made ... to move the circuits and the panel boards into the OR ... that the physical enclosure, absent foam and paint, was precluded at that time. Is that what you are saying?"
PLAINTIFF'S COUNSEL: "Very much ... No, there *probably* was not room for that. This is what my client said in the correspondence. He admits that." Tr. 38:4–18 (emphasis added).
PLAINTIFF'S COUNSEL: "We could not have done, built that horizontal analog to the vertical wall. There wasn't space for that. There *probably* wasn't space for that almost from the very beginning." Tr. 62:21–24, (emphasis added).
THE COURT: "At what time was [physical enclosure] impossible so that the MI cable was the only alternative?"

PLAINTIFF'S COUNSEL: "I don't know, really." Tr. 64:8–10, August 13, 2002.

43. Specification 16050, ¶ 1.8.C, "Work Performance." Def.'s App. 10.

44. VA Acquisition Regulation 852.236–80, "Subcontracts and Work Coordination," ¶ (b), Def.'s Cross–Mot. Summ. J.App. 20.

45. "The parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight." *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 558 (Fed.Cir.1982).

absence of evidence supporting Plaintiff's case, shifting the burden to Plaintiff to present evidence of genuine issues of material fact. Plaintiff has failed to present a foundation of facts sufficient to support a verdict in its favor, even with the benefit of all reasonable inferences. Accordingly, for the reasons stated above, the Court **DENIES** Plaintiff's motion for summary judgment and **GRANTS** summary judgment for Defendant.

The Clerk of the Court is directed to dismiss the complaint.