**TURNER CONSTRUCTION CO., INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5055.

United States Court of Appeals, Federal Circuit.

May 12, 2004.

Herman M. Braude, Braude & Margulies, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Michael A. Lewis.

Glenn I. Chernigoff, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Associate Attorney General; David M. Cohen, Director; and Bryant G. Snee, Assistant Director. Of counsel was James W. Poirier, Attorney.

Before MAYER, Chief Judge,
NEWMAN and LINN, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Turner Construction Co. (Turner) appeals the judgment of the United States Court of Federal Claims,[1] denying Turner's claim for compensation for additional costs incurred in performance of a construction contract with the United States Department of Veterans Affairs (DVA). We reverse the judgment as to entitlement, and remand for further proceedings.

1. *Turner Constr. Co. v. United States*, 54 Fed. Cl. 388 (2002).

## DISCUSSION

On appeal of judgments of the Court of Federal Claims, plenary review is given to the court's legal conclusions, and factual findings are reviewed under the clearly erroneous standard. *See Massachusetts Bay Transp. Auth. v. United States,* 254 F.3d 1367, 1372 (Fed.Cir.2001); *City of El Centro v. United States,* 922 F.2d 816, 819 (Fed.Cir.1990). The interpretation of contracts is reviewed as a matter of law. *See Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1292 (Fed. Cir.2002). Contracts between the government and private contractors are subject to the general law of contracts. *See Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 607, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000).

When a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, we apply the rule of *contra proferentem,* which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document. *United States v. Turner Constr. Co.,* 819 F.2d 283, 286 (Fed.Cir. 1987). However, the court will consider whether the ambiguity or lack of clarity was sufficiently apparent that there arose an obligation on the contractor to inquire as to that provision before entering into the contract. *See P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1355–56 (Fed.Cir.2002) (where a government contract contains latent ambiguity, the court will construe the ambiguous term against the government as drafter of the contract, provided that the contractor's interpretation was reasonable and the contractor relied on that interpretation when preparing its bid); *Zinger Const. Co. v. United States,* 807 F.2d 979, 981 (Fed.Cir.1986) (a reasonable contractor is expected to recognize patent ambiguities and to inquire about the work to be performed). The parties are charged with knowledge of law and fact appropriate to the subject matter, and reasonable professional competence in reading and writing contracts is presumed. *See Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir. 1997).

The DVA and Turner entered into a contract for construction of an addition to the DVA Medical Center in Boston. While construction was proceeding, Turner disagreed with the DVA resident engineer about whether the contract required certain fire-rated electrical feeders and panel-boards in the operating room area on the third floor of the addition. The DVA resident engineer directed Turner to install the disputed materials. Turner complied, incurring the additional costs that are subject of this appeal.

The contract required Turner to "Furnish and install electrical wiring, systems, equipment and accessories in accordance with the specifications and drawings" and to comply with the applicable electrical codes. The government states that the contract should be read to include certain fire-rated electrical installations for the operating rooms, based on the contract's requirement of compliance with electrical codes, and that this overrides any inadequacy in the contract specifications or error in the government's electrical drawings. The government states that the contract should at least be viewed as patently ambiguous, placing on Turner the duty to inquire during the bidding process with respect to the erroneous drawings. Turner states that the contract is not ambiguous, and that the electrical require-

ments as set forth in the contract specifications and electrical drawings do not conflict with the applicable codes.

The contract contained detailed drawings showing the electrical systems for the operating room area, as for the other areas of the construction. The drawings also provided details of the emergency system. The dispute is focused on whether the operating room electrical feeders and panelboards should have been viewed as part of a fire-rated emergency system, although the contract specifications and drawings were clear that fire-rated electricals were not designated for the disputed feeders and panelboards.

The Massachusetts State Electrical Code (MSEC) requires that emergency equipment have fire-rated feeders and enclosures. Relevant provisions of the MSEC include:

1.22A. Massachusetts State Electrical Code requires all emergency generation and distribution equipment be installed within dedicated 2–hour fire-rated rooms, closets or shafts. All equipment, conduit, piping, ductwork, etc., alien to the emergency system shall not be located within these rooms, closets, or shafts except the equipment that serves these rooms, closets or shafts.

B. All emergency equipment such as generators, transfer breakers, switchboards and panel-boards, shall be installed in 2–hour fire-rated rooms....

C. All portions of the emergency system, such as feeders, located outside of rooms, closets or shafts described herein above shall also be enclosed within 2–hour fire-rated enclosures....

The government states that MSEC 1.22 requires that the operating room feeders and panel-boards be deemed "emergency electrical systems" and therefore must be 2–hour fire-rated.

Turner states that the contract does indeed require fire-rated feeders for the emergency electrical system, as shown in the contract, but that the contract specifications and electrical drawings do not include the operating room areas as part of the emergency electrical system, and are explicit as to the aspects that do and do not require fire-rating. It is undisputed that no description in the contract or any contract specification or electrical drawing shows the operating rooms as part of the hospital's emergency system. The government argues that such designation of the operating rooms is unnecessary, referring to National Electrical Code Article 517–30 entitled "Essential Electrical Systems for Hospitals." This NEC Article requires that hospitals have a separate "emergency system" for "circuits essential to life safety and critical patient care," in the following provisions:

517.30(b) General.

(1) Essential electrical systems for hospitals shall be comprised of two separate systems capable of supplying a limited amount of lighting and power service, which is considered essential for life safety and effective hospital operation during the time the normal electrical service is interrupted for any reason. These two systems shall be the emergency system and the equipment system.

(2) The emergency system shall be limited to circuits essential to life safety and critical patient care. These are designated the life safety branch of the critical branch.

(3) The equipment system shall supply major electric equipment neces-

sary for patient care and basic hospital operation.

* * *

(c) Wiring Requirements.

(1) Separation from Other Circuits. The life safety branch and critical branch of the emergency system shall be kept entirely independent of all other wiring and equipment and shall not enter the same raceways, boxes, or cabinets with each other or other wiring.

Turner points out that the NEC and MSEC provisions do not specify which areas are included in the emergency system, while the contract drawings and specifications are specific as to the emergency system, including which electrical circuits must be fire-rated, as well as the nature of the fireproofing to be employed. Turner also points out that while the hospital codes require a separate emergency system for essential circuits when "the normal electrical service is interrupted for any reason," the codes do not require fire-rating for the separate system. Turner states that these code provisions relate to emergency electrical back-up, not fire-rating, and stresses that neither the NEC nor the MSEC specifies the operating rooms as part of the emergency system or as requiring fire-rated electrical installations.

The contract indeed provides for an emergency electrical system, and the specifications/drawings show the details of the emergency system, including the portions that require fire-rated installation. The NEC requirement of a separate emergency electrical system does not require use of fire-rated wiring for this system. While the MSEC requires that the emergency system be fire-rated, it does not place the

operating room feeders and panels in the emergency system. Neither the contract, its specifications, the drawings, nor the electrical codes specify fire-rating for the operating room panels and electrical feeders.

In contrast, the drawings explicitly show that the operating room walls are fire-rated. However, the electrical panels feeding those rooms are designated "PP," the designation for standard power panels. Although the government argues that these designations were placed on the drawings "only to show wiring size and location, not fire protection requirements," no evidence supports this argument. To the contrary, the same drawings explicitly show where fire-rating is required, and other feeders and panels are designated EP (emergency power), CP (critical power), or LS (life safety power). In contrast, the panels feeding the operating rooms are designated PP (ordinary power panels). As a further example, Drawing 1–E37 refers to the feeders for the elevator control panels and states: "PENTHOUSE EMERGENCY FEEDERS SHALL CHANGE TO MI CABLE PRIOR TO PENETRATING THE THIRD FLOOR EMERGENCY ELECTRICAL CLOSET WALL. PROVIDE 2 HR RATED MI CABLE," and the elevator panels are designated "Critical Power."

There are numerous designations of fire-rating throughout the drawings. Several shafts, partitions, panels, electrical rooms, and electrical closets are shown on the drawings as fire-rated. The operating room panel feeders are shown in the drawings and required by the contract to be installed in nonflexible metal raceways through non-fire-rated partitions. The drawings and wiring diagrams for the operating room power panels, including leg-

ends and cross-references on the drawings, show these feeders not designated as fire-rated. The drawings contain the legend, in capital letters, that the operating room type "E" room partitions have "NO FIRE RESISTANCE RATING." In contrast, the elevator control panels and the rooms in which they are housed are required to be fire-rated, including specified use of MI cable. The Court of Federal Claims found that Note 1 on the electrical drawings, which states: "All O.R. critical branch circuitry should be from panels dedicated to the O.R.," means that all operating room circuitry is part of the emergency system, and must be fire-rated. However, it is clear that Note 1 does not place the operating room circuitry in the emergency system or designate that circuitry as fire-rated.

■ The government states that it is "immaterial" that the NEC and the MSEC do not require fire-ratings for the operating room electrical panels. However, neither does the contract or its specifications or drawings require such materials. The government's litigation position that the drawings are in error does not place the burden of that error on the contractor, for there is no hint of such error in the contract. *See P.R. Burke*, 277 F.3d at 1355–56 (latent ambiguities are not charged to the contractor); *Robins Maintenance, Inc. v. United States*, 265 F.3d 1254, 1257 (Fed. Cir.2001) ("Whenever the government uses specifications in a contract, there is an accompanying implied warranty that these specifications are free from errors.") As discussed in *Robins Maintenance*, 265 F.3d at 1257, "The test for recovery based on inaccurate specifications is whether the contractor was misled by these errors."

■ The contract specifications and electrical drawings are clear that fire-rated feeders are not specified for the operating room panels, and indeed the drawings show the transition from fire-rated to ordinary electrical feeders. The contract specifications, which are stated to prevail over the drawings, do not require fire-rating for the disputed electrical feeders and panels, and the applicable codes do not render the specifications non-compliant.

Turner's reading of the contract in conjunction with the codes was that of a reasonable and prudent contractor. *See Blake Constr. Co. v. United States*, 987 F.2d 743, 746 (Fed.Cir.1993) (determining the understanding of a reasonable and prudent contractor); *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971) (the court must place itself "into the shoes of a 'reasonable and prudent' construction contractor"). If there indeed were governmental error, it is not apparent from the relevant documents.

We conclude that Turner's reading of the contract and reliance on the specifications and drawings was reasonable, and that the government's requirement that additional fire-rated systems be installed was a material change. Turner is entitled to recover the additional costs incurred. We remand for determination of quantum.

*REVERSED AND REMANDED.*

MAYER, Chief Judge, dissenting.

Because the operating room panelboards and feeders were part of the emergency electrical system, and because the contract requires two-hour fire-rated protection for the emergency electrical system, I dissent.

"Contracts are viewed in their entirety and given the meaning imputed to a reasonably intelligent contractor acquainted

with the involved circumstances, regardless of whether labelled design, performance, or both." *Blake Constr. Co. v. United States*, 987 F.2d 743, 746 (Fed.Cir.1993) (citations omitted). "An interpretation which gives reasonable meaning to all parts of a contract is preferred to one which renders part of it insignificant or useless." *Id.* at 746–47. As we have also noted, "[a] contract should be interpreted in such a way that all parts make sense" when interpreted as a whole. *Hughes Communications Galaxy v. United States*, 998 F.2d 953, 958 (Fed.Cir.1993).

The main issue boils down to whether the operating room panelboards and feeders were part of the emergency electrical system based upon the specification, the drawings, the incorporated FAR provisions, and the National Electrical Code ("NEC"). If so, the contract unambiguously required two-hour fire-rated protection for the feeders and panelboards supplying emergency power to the operating room. I agree with the trial court's ruling that the contract fully defined the emergency electrical system to include the operating room panelboards and feeders.

When read together, the plain language of section 16050, paragraph 1.22, incorporating the NEC definition of "Emergency System," and of section 16111 mandate that feeders and panelboards receive two-hour fire-rated protection. Section 16050, paragraph 1.22.C requires that "all portions of the emergency system ... shall ... be enclosed within two hour fire rated enclosures." NEC article 517–3, defines "Emergency System" as, "A system of feeders and branch circuits ... intended to supply alternate power to a limited number of prescribed functions vital to the protection of life and patient safety, with automatic restoration of electrical power

within 10 seconds of interruption." As configured, the operating room panelboards had two potential sources of power, normal commercial electricity and an emergency generator. The feeders at issue were the alternate emergency source of power to the operating room panelboards. The feeders and panelboards were part of the "Critical Branch," as defined in NEC article 517–3, in that they were "[a] subsystem of the emergency system consisting of feeders ... supplying energy to ... selected receptacles serving areas and functions related to patient care...." Additionally, the feeders and panelboards were also part of the NEC definition of "Essential Electrical System" because they were part of "[a] system ... designed to ensure continuity of electrical power to designated areas, and functions of a health care facility during disruption of normal power sources...." Finally, Section 16111, paragraph 3.2.B, required that the "Essential (Emergency) raceway systems ... shall be either in a rated and approved two (2) hour enclosure or the raceway shall be two (2) hour rated...." The NEC definitions, set forth as minimum installation standards, combined with the specification requirements make clear that the feeders and panelboards at issue were part of the "emergency system" that was required to be fire-rated.

The court relies upon negative inferences deduced from the contract drawings to find to the contrary. Because drawing 1 E37 makes the explicit statements that the elevator feeders "shall change to MI cable prior to penetrating the third floor," and that Turner was to "provide 2 HR rated MI cable" for the elevator feeders, the court draws the negative inference that separate feeders are not part of the emergency electric systems requiring two-hour fire-rated protection. Examining the

entire contract, however, leads to a broader, more plausible interpretation. The penthouse wiring transition through the operating room third-floor was simply a "special condition" and the conduit-and-wire designations indicated wiring size, not fire protection requirements. Also, Turner should have been alerted to the fact that the drawings' references to use of MI cable for certain locations did not preclude two-hour fire protection because section 16111 explicitly stated that *either* MI cable *or* a two-hour fire-rated enclosure would satisfy the requirement. Thus, even if Turner's negative inference were correct—that drawings 1E1 and 1E37 required the installation of the conduit-and-wire option and not MI cable—the two-hour fire-rated protection could still have been satisfied through the installation of a two-hour fire-rated enclosure.