ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| First Street Contractors, LLC | ) | ASBCA No. 64028 |
| | ) | |
| Under Contract No. W912P6-20-C-0021 | ) | |

APPEARANCES FOR THE APPELLANT:     Jonathan R. Neri, Esq.
Lauren R. Brier, Esq.
Josephine R. Farinelli, Esq.
  PILIEROMAZZO PLLC
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Ian T. McDaniel, Esq.
  Engineer Trial Attorney
  U.S. Army Engineer District, Chicago

OPINION BY ADMINISTRATIVE JUDGE SWEET
ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This appeal involves a contract between appellant, First Street Contractors, LLC (First Street) and the United States Army Corps of Engineers (Corps) for First Street to replace existing grit dewatering equipment at the Gary Sanitary District's wastewater treatment plant in Gary, Indiana. First Street claims that the Corps: (1) provided defective specifications because the contract drawings allegedly showed openings in the existing concrete floor that were larger than grit pumps that First Street had to place below the concrete floor, when the existing concrete floor openings actually were smaller than the grit pumps (Concrete Floor Openings Claim)[1] (compl. ¶¶ 65-78); (2) constructively changed the contract by requiring that valves larger than three inches be glass lined (Glass Lined Valve Claim) (*id.* ¶¶ 100-144); and

---

[1] First Street also alleges a Type I differing site condition claim regarding the concrete floor openings (compl. ¶¶ 79-99). When an appellant alleges both a defective specifications claim and a differing site condition claim, and the claimed defect in the specifications is a failure to disclose the alleged differing site condition, the two claims collapse into a single differing site condition claim. *Meridian Eng'g Co. v. United States*, 885 F.3d 1351, 1361 (Fed. Cir. 2018). Thus, as the parties agree we should do, we treat First Street's defective specifications and differing site condition claims regarding the concrete floor openings as a differing site condition claim (gov't mot. at 22; app. mot. at 16).

(3) constructively changed the contract by requiring First Street to provide continual watch services for a temporary grit pump (Temporary Grit Pump Watch Services Claim) (*id*. ¶¶ 145-167). The parties have cross-moved for summary judgment on the Concrete Floor Openings, Glass Lined Valve, and Temporary Grit Pump Watch Services Claims.

For the reasons discussed below, we deny the parties' cross-motions for summary judgment on the Concrete Floor Openings Claim because there are genuine issues of material fact as to whether First Street reasonably interpreted and relied upon the contract documents to conclude that the existing concrete floor openings were larger than the grit pumps, and whether the existing concrete floor openings being smaller than the grit pumps was reasonably foreseeable based upon all the information available at the time of bidding. We also deny the parties' cross-motions for summary judgment on the Glass Lined Valve Claim because the contract is ambiguous as to whether valves larger than three inches had to be glass lined, and there is a genuine issue of material fact as to whether, based upon extrinsic evidence, a reasonable contractor in First Street's position would have interpreted the ambiguous contract to require that valves larger than three inches be glass lined. Finally, we deny the parties' cross-motions regarding the Temporary Grit Pump Watch Services Claim because there is a genuine issue of material fact as to whether the Corps' direction that First Street provide continuous temporary grit pump watch services required work beyond the contract's requirement.

For the reader's convenience, we will address the facts and analysis of each claim together.

## CONCRETE FLOOR OPENINGS CLAIM

I.      Concrete Floor Openings Claim Statement of Facts (SOF) for Purposes of Deciding the Motions

1. On August 20, 2020, the Corps issued Solicitation No. W912P620B0020 (Solicitation) for a contractor to replace the existing grit dewatering equipment[2] at the Gary Sanitary District wastewater treatment plant in Gary, Indiana with higher capacity and more robust equipment (SMF ¶¶ 1, 4 (citing R4, tab 1 at 1)).[3] The grit dewatering equipment was located inside the Detritor Building (SMF ¶ 5).

---

[2] Grit dewatering equipment transports and treats grit, or sewage. It consists of detritor tanks to hold the grit, pumps to move the grit, and pipes to transfer the grit to a classifier where it is treated (SMF ¶ 6).

[3] "SMF" refers to the joint stipulation of material fact.

2

2.  The Solicitation included a clause pursuant to Federal Acquisition Regulation (FAR) 52.236-27, which provided bidders the opportunity to arrange site-visits (SMF ¶ 18 (citing R4, tab 1 at 14)).  However, given the ongoing COVID-19 pandemic, First Street attended a virtual pre-bid meeting on September 2, 2020, in place of an in-person inspection (SMF ¶ 19).

3.  The specifications in the Solicitation required First Street to provide and install two new Smith & Loveless, Inc. (Smith & Loveless) 6D3J Pista turbo grit pumps (Grit Pumps) below an existing concrete floor, which contained two openings through which First Street had to lower the Grit Pumps (SMF ¶¶ 11, 13-15; R4, tab 2 at 975, tab 3).  In particular, Drawing Sheet M-5 (DETRITOR BUILDING GRIT NEW WORK – PLANS) depicted the floor plan for the wastewater treatment plant pump room as follows:





(R4, tab 3 at 1; *see also* SMF ¶ 13)  Drawing Sheet M-6 (DETRITOR BUILDING GRIT NEW WORK – SECTIONS) included the following depiction of the Grit Pumps and concrete floor openings in the wastewater treatment plant pump room:



(R4, tab 3 at 2; *see also* SMF ¶ 14).  Drawing Sheet M-6 labeled certain features, such as:  "Grit Pump," "Grit Pump Local Control Station," and "6"-Grit-DI-Discharge"; and appears to show those features with darker lines than other, unlabeled features, such as what appears to be stairs, railings, walls, floors, floor openings (R4, tab 3 at 2).  Drawing Sheet M-2 (MECHANICAL NOTES AND PIPE AND VALVE SCHEDULES) stated, under "Demolition Notes," that "[d]imensions and locations of existing equipment, appurtenances and structures have been obtained from existing record drawings and field survey.  All should be field verified."  (R4, tab 10 at 34 (emphasis omitted))  Drawing Sheet M-2 also stated under "Demolition Notes," that "[i]t is not warranted that the locations and dimensions of existing equipment, appurtenances and structures are exact.  It is the responsibility of the contractor to field verify all dimensions and locations of existing piping, equipment, electrical conduits, HVAC, Ducts, etc. as required to be removed for the new construction." (*Id*. (emphasis omitted))  The Contract also includes demolition plans, including for the Detritor Building; although those plans do not appear in the record (R4, tab 4 at 25-26).

4

4.  The specifications and drawings did not provide numerical dimensions for the Grit Pumps (SMF ¶ 12), and were silent as to whether First Street had to obtain information about the Grit Pumps' dimensions from Smith & Loveless (*id*. at ¶ 20  (citing R4, tabs 1-1.5)).  Moreover, Smith & Loveless did not provide First Street with a drawing indicating the Grit Pumps' dimensions (SMF ¶ 22).  Nor did the contract documents provide numerical dimensions for the existing concrete floor openings (SMF ¶ 15), or specifically identify the need to perform demolition on the existing concrete floor (*id*. at ¶16).

5.  On September 30, 2020, the Corps awarded Contract No. W912P620C0021 (Contract) to First Street (SMF ¶ 9 (citing R4, tab 4)), based upon the Solicitation.  The Contract incorporated the same specifications and drawings that had been incorporated into the Solicitation (SMF ¶ 10).

6.  The Grit Pumps were delivered to the project site in September 2021 (SMF ¶ 23).

7.  On February 25, 2022, First Street sent the Corps Request for Information (RFI) 0067, which indicated that the Grit Pumps were too large to fit through the existing concrete floor openings (SMF ¶ 24 (citing R4, tab 8 at 1)).  Therefore, with the Corps' approval, First Street enlarged the existing concrete floor openings (SMF ¶¶ 24, 28-29).

8.  On October 30, 2023, First Street sent the Corps a request for an equitable adjustment (REA), seeking $22,450.08 for the costs of enlarging the cement floor openings (SMF ¶ 30 (citing R4, tab 4.6 at 12-13)).  The Corps did not provide a formal response to the REA (SMF ¶ 31).

9.  On June 20, 2024, First Street submitted a certified claim to the Corps (R4, tab 10).  On September 16, 2024, the contracting officer (CO) issued a final decision (COFD) denying the claim (R4, tab 11).  This appeal followed.

II.    Summary Judgment Standard

In deciding motions for summary judgment, the Board looks to Rule 56 of the Federal Rules of Civil Procedure for guidance.  Board Rule 7.  We will grant summary judgment only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  All significant doubt over factual issues must be resolved in favor of the party opposing summary judgment.  *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  In deciding summary judgment motions, we do not weigh evidence, or make credibility determinations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Moreover, we draw all reasonable inferences in favor of the non-movant.  *Id*.  A genuine issue of material fact arises when the non-movant presents

sufficient evidence upon which a reasonable factfinder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the non-movant. *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993). "The moving party bears the burden of establishing the absence of any genuine issue of material fact . . . ." *Colonna's Shipyard, Inc.*, ASBCA No. 59987 *et al.*, 16-1 BCA ¶ 36,518 at 177,902 (citing *Mingus Constr., Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987)). "Once the moving party has met its burden of establishing the absence of disputed material facts, then the non-moving party must set forth specific facts, not conclusory statements or bare assertions, to defeat the motion." *Id*. (citing *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984)).

### III.    Concrete Floor Openings Claim Decision

We deny the parties' cross-motions for summary judgment on the Concrete Floor Openings Claim because there is a genuine issue of material fact as to whether there was a Type I differing site condition. In order to establish a Type I differing site condition claim, a contractor must prove that: (1) the contract contained a positive indication of the conditions at the site; (2) the contractor reasonably interpreted and relied upon the indicated site conditions; (3) the conditions encountered were materially different from those indicated; (4) the conditions encountered were reasonably unforeseeable based upon all the information available at the time of bidding; and (5) the contractor's injury was caused solely by the differing site condition. *David Boland, Inc.*, ASBCA No. 61923 *et al.*, 21-1 BCA ¶ 37,822 at 183,656; *see also H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998).[4] Because the first factor requires a positive indication, a "contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be." *David Boland*, 21-1 BCA ¶ 37,822 at 183,656 (quoting *Comtrol Inc. v. United States*, 294 F.3d 1357, 1363 (Fed. Cir. 2002)). "The indications need not be explicit or specific, but they must be 'reasonably plain or positive' or are such as to have 'induced reasonable reliance by [the contractor] that the conditions would be more favorable than those encountered.'" *Nova Grp., Inc.*, ASBCA No. 55408, 10-2 BCA ¶ 34,533 at 170,321 (quoting *Pacific Alaska Contractors v. United States*, 436 F.2d 461, 469 (Ct. Cl. 1971)). Mere silence is insufficient, *id*., but an indication may be implied from the specifications or other design features of the contract. *Randa/Madison Joint Venture III*, ASBCA No. 49452, 99-2 BCA ¶ 30,553 at 150,877 (citing *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 881 (Ct. Cl. 1970)).

---

[4] For purposes of these cross-motions, the parties do not dispute that the condition encountered of the existing concrete floor openings being smaller than the Grit Pumps materially differed from the alleged indication that the existing concrete floor openings were larger than the Grit Pumps, or that First Street's injury of incurring increased costs to expand the concrete floor openings were caused solely by the alleged differing site condition (gov't mot. at 22-25; app. mot. at 16-21).

6

In determining whether a contract indicates that a condition exists, "clear and unambiguous [contract provisions] must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." *CDM Constructors, Inc.*, ASBCA No. 60454 *et al.*, 18-1 BCA ¶ 37,190 at 181,012 (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc)). "An ambiguity exists when a contract is susceptible to more than one reasonable interpretation." *Id.* (quoting *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004)). "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.'" *Id.* (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). As we have held, "the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Id.* (quoting *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965)). Thus:

> We must seek to put ourselves in the position of appellant at the time he bid on the contract, *i.e.*, we must seek the meaning that would be attached to the language by a reasonably intelligent bidder in the position of appellant, who would be expected to have the technical and trade knowledge of his industry and to know how to read and interpret technical engineering specifications and perform construction work in accordance with such specifications.

*Id.* (quoting *Adrian L. Roberson, d/b/a Roberson Construction Co.*, ASBCA No. 6248, 61-1 BCA ¶ 2,857 at 14,915). "One cannon of construction that we use to determine the meaning of language is *expressio unius est exclusio alterus*, which means 'the expression of one thing is the exclusion of another.' *Cook v. Principi*, 318 F.3d 1334, 1339 n.8 (Fed. Cir. 2002); *ITT Defense Communications Division*, ASBCA No. 44791, 98-1 BCA ¶ 29,590 at 146,703-04." *Symvionics, Inc.*, ASBCA No. 60335, 17-1 BCA ¶ 36,790 at 179,323.

Contract interpretation, particularly the issue of whether a contract is ambiguous, is a question of law that generally is amenable to summary judgment. *R.L. Persons*, 18-1 BCA ¶ 37,007 at 180,236-37 (citing *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002); *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). However, the determination of the reasonableness of each party's interpretation of the language may raise a question of fact precluding summary judgment. *Id.*

Here, as discussed below, there is no genuine issue of material fact but that the Contract contained a positive indication of concrete floor openings that were larger than the Grit Pumps. However, neither party has met its burden of establishing the absence of any genuine issue of material fact as to whether First Street reasonably interpreted and relied upon that indication to conclude that the concrete floor openings as they existed prior to the Grit Pumps installation were larger than the Grit Pumps. Moreover, neither party has met its burden of establishing the absence of any genuine issue of material fact as to whether the condition encountered of the concrete floor opening as they existed prior to the Grit Pumps installation being smaller than the Grit Pumps was reasonably foreseeable based upon all of the information available at the time of bidding. Thus, there is a genuine issue of material fact as to whether there was a Type I differing site condition.

A.     There Is no Genuine Issue of Material Fact but That Sheet M-6 of the Contract Contained a Positive Indication of Concrete Floor Openings That Were Larger Than the Grit Pumps

While it is undisputed that the contract documents did not provide numerical dimensions for the concrete floor openings and the Grit Pumps (Concrete Floor Openings Claim SOF ¶ 4), there is no genuine issue of material fact but that Drawing Sheet M-6 contained a positive indication of concrete floor openings that were larger than the Grit Pumps below those openings.[5] In particular, Drawing Sheet M-6, as annotated by the Corps in its reply brief to highlight the concrete floor openings, showed as follows:

---

[5] The top drawing on Drawing Sheet M-5 showed a circle, which was labeled "GRIT PUMP," inside three concentric squares (Concrete Floor Openings SOF ¶ 3). However, neither party presents evidence as to what on Drawing Sheet M-5 represented the concrete floor openings because there are no concrete floor opening labels on the drawing, or affidavits or annotations identifying the location of the concrete floor openings on Drawing Sheet M-5 (app. mot. at 6-7; gov't reply at 2-4). Thus, there are genuine issues of material fact as to whether Drawing Sheet M-5 also showed that the concrete floor openings were larger than the Grit Pumps (*id.*).

8



(gov't reply at 2; *see also* Concrete Floor Openings Claim SOF ¶ 3). The only reasonable inference that a factfinder could draw comparing the width of the concrete floor openings and the Grit Pumps shown on Drawing Sheet M-6 is that the concrete floor openings were larger than the Grit Pumps. Indeed, the Corps does not dispute that conclusion. (Gov't reply at 2)

      B.    <u>Neither Party Has Met its Burden of Establishing the Absence of any Genuine Issue of Material Fact as to Whether First Street Reasonably Interpreted and Relied Upon That Indication</u>

However, neither party has met its burden of establishing the absence of any genuine issue of material fact as to whether First Street reasonably interpreted and relied upon that indication in Drawing Sheet M-6 to conclude that the concrete floor openings as they existed prior to the Grit Pumps installation were larger than the Grit Pumps. On the one hand, as the Corps argues (gov't reply at 3-4), it is reasonable to infer from the fact that Drawing Sheets M-6 is entitled "NEW WORK" that it merely depicted the Corps' expectations of the project's post-installation results, as opposed to the existing conditions pre-installation (Concrete Floor Openings Claim SOF ¶ 3).

On the other hand, a reasonable fact-finder could conclude that a reasonable contractor could interpret Drawing Sheet M-6 as indicating that the concrete floor openings as they existed prior to the Grit Pumps installation were larger than the Grit

Pumps.  First, a reasonable fact-finder could conclude that a reasonable contractor would understand that, in addition to new work, Drawing Sheet M-6 also showed existing conditions because Drawing Sheet M-6 shows some features, such as stairs, walls, floors, and railings, the construction of which  were plainly beyond the scope of the new work required by this Contract to replace the grit dewatering system.  Second, a reasonable fact-finder could conclude that a reasonable contractor would understand that Drawing Sheet M-6 distinguished the new work from the existing conditions by labeling the new work and indicating it with darker lines because Drawing Sheet M-6 labeled and identified with darker lines features that a reasonable fact-finder could conclude are grit dewatering equipment, such as the "Grit Pump," "Grit Pump Local Control Station," and "6"-Grit-DI-Discharge", while depicting with lighter lines those features that were not grit dewatering equipment, such as stairs walls, floors, and railings.  (SOF ¶¶ 3-4)  Based upon those conclusions, a reasonable fact-finder could infer that a reasonable contractor would understand that Drawing Sheet M-6 indicated that the sizing of the concrete floor openings was a pre-existing condition because Drawing Sheet M-6 did not label the concrete floor openings and identified them with lighter lines.

Supporting this interpretation is what is missing from other drawings.  The Contract appears to contain numerous drawings showing demolition plans, including for the Detritor Building - which apparently do not show any demolition for the concrete floor openings (R4, tab 4 at 25-26).[6]  Under the *expressio unius* cannon of construction, a reasonable fact-finder could infer from any inclusion of demolition of other features the exclusion of demolition of the concrete floors.  *See Symvionics*, 17-1 BCA ¶ 36,790 at 179,323.  Further, a reasonable fact-finder could infer from the absence of any contractually-mandated demolition of the concrete floors and the fact that the post-installation results was the concrete floor openings were larger than the Grit Pumps that the pre-existing concrete floor openings were larger than the Grit Pumps (app. mot. at 20-21).  Thus, there is a genuine issue of material fact as to whether a reasonably intelligent bidder in First Street's position - who had the technical and trade knowledge of his industry and knew how to read and interpret technical engineering specifications and perform construction work in accordance with such specifications, reasonably would interpret and rely upon Drawing Sheet M-6 to conclude that the existing concrete floor openings as they existed prior to the Grit Pumps installation were larger that the Grit Pumps.

The Corps also points to the Demolition Notes on Drawing Sheet M-2 (gov't reply at 2-3), which required First Street to field verify the dimensions of all existing

---

[6] While the Contract includes an index identifying drawings for demolition plans, including for the Detritor Building, the actual drawings are not in the record (R4, tab 4 at 24-25).  Nevertheless, Watts asserts in its reply that the drawings did not require demolition on the concrete slab (app. reply at 6-7).  Thus, precisely what the demolition drawings show requires further factual development.

equipment and structures (Concrete Floor Openings Claim SOF ¶ 3).  As an initial matter, the Court of Claims has cautioned against reading such clauses as baring claims regarding defective drawings where a contractor fails to verify dimensions because of concerns about the effects that such a reading would have upon the integrity of the competitive bidding process.  *Gevyn Constr. Corp. v. United States*, No. 158-74, 1979 WL 16487, at *30-31 (Ct. Cl. Mar. 16, 1979).  In any event, as discussed in greater detail below, there are genuine issues of material fact as to whether First Street could verify the dimensions of the concrete floor openings.  *See Id.*

C.   Neither Party Has Met its Burden of Establishing the Absence of any Genuine Issue of Material Fact as to Whether the Condition Encountered Was Reasonably Unforeseeable Based Upon all of the Information Available at the Time of Bidding

Further, neither party has met its burden of establishing the absence of any genuine issue of material fact as to whether the condition encountered of the existing concrete floor openings being smaller than the Grit Pumps was reasonably unforeseeable based upon all the information available at the time of bidding.  While the Contract permitted a site-visit, the undisputed evidence shows that First Street only attended a virtual pre-bid meeting due to the COVID-19 pandemic (Concrete Floor Openings Claim SOF ¶ 2).  Neither party presents evidence as to whether the Corps would have permitted an in-person site-visit in light of the COVID-19 pandemic (gov't mot. 25; gov't reply 3; app. reply 5).  Further, neither party presents evidence as to whether, if First Street could have conducted an in-person site-visit, a reasonable contractor would have conducted such an in-person site-visit during the COVID-19 pandemic and whether the size of the existing concrete floor openings would have been reasonably foreseeable at such an in-person site-visit.  *Id.*  Nor does either party present evidence as to whether, if a reasonable contractor would not have conducted an in-person site-visit, the size of the existing concrete floor openings was reasonably foreseeable based upon the virtual site-visit.  *Id.*

Moreover, while the Corps argues that First Street could have determined the dimensions of the Grit Pumps from Smith & Loveless, First Street argues that Smith & Loveless would not provide the dimensions of the Grit Pumps until after First Street was awarded the Contract for proprietary reasons (gov't mot. 25; app. reply at 13 n.2).  However, neither party submits evidence in support of their respective arguments (*id.*).  Therefore, neither party has met its burden of establishing the absence of any genuine issue of material fact as to whether it was reasonably foreseeable from all of the information available at the time of bidding that the existing concrete floor openings were smaller than the Grit Pumps.

In sum, there are genuine issues of material fact that preclude the granting of summary judgment for either party on the Concrete Floor Openings Claim.

# GLASS LINED VALVE CLAIM

## I. Glass Lined Valve Claim SOF for Purposes of Deciding the Motions

1. Specification § 01 11 00 (SUMMARY OF WORK), ¶ 1.1.1.1 (Project Features) required First Street to "[p]rovide and install new glass lined grit piping valves and all other process mechanical equipment shown on the Contract Drawings and Specifications, but not supplied by Smith and Loveless" (R4, tab 2 at 74). Specification § 40 05 13, ¶ 2.8.5.1 (Eccentric Valve) (Paragraph 2.8.5.1) stated that:

> Nonlubricated type eccentric valves, 3 inch and smaller, shall be rated for 175 [pounds per square inch gauge] service at 140 degrees [Fahrenheit]. Valves shall be capabl [sic] of sealing in both directions at the rated pressure, and have an unobstructed flow path when open. Valves shall have drip-tight shutoff with pressure from either direction, and [American Society for Testing and Materials (ASTM)] A536, Ductile Iron bodies with glass lining to match ductile iron piping with top entry bolted bonnet, in accordance with [American Society of Mechanical Engineers (ASME)] B16.1 flanged end connections, ASTM A536, Grade 64-45-12 ductile iron, neoprene lined single piece plugs with minimum port area of 80% of the nominal pipe area ports, stainless steel seats with full 360 degree seating by contact of a resilient seating material on the plug mating with welded-in seating surface on the body and be nonjamming in the closed position, self-lubricating stainless steel stem bearings, and polytetrafluoroethylene (PTFE) seals. Plugs shall be removable without removing the valve from the line and have an integral upper and lower shaft with upper and lower journals to prevent entrance of solids into the journals. Bearings shall be permanently lubricated. Stem seals shall be v-ring with externally adjustable and repackable without removing the bonnect [sic] from the valve. Packing and glad shall be accessible and externally adjustable. Valves shall be equipped with handwheel operators. A suitably sized steel actuator mounting bracket shall be provided to provide an air gap between the actuator and the valve stem seal. Under no circumstance shall the gear box be mounted directly to the top body flange such that leakage could directly enter the gear box. Provide adjustable limit stops for both opening and closing and a clearly marked position indicator. Greater Than

12

4 Inches: Worm gear manual operators with handwheel.
Furnish chain wheel operators for valves mounted over 7 feet
above operating floor.  All connecting hardware shall be Type
316 stainless steel.

(*Id*. at 875-76 (emphasis added))

2.  While Drawing Sheets M-5 and M-6 required that pipes be glass lined, neither of those drawing sheets, nor Drawing Sheet M-2 (Mechanical Notes and Pipe and Valve Schedules), mentioned glass lining for plug valves (SMF ¶¶ 35-37 (citing R4, tab 3, tab 10 at 34)).

3.  The Corps rejected certain six-inch plug valves because they were not glass lined and the Contract purportedly required all plug valves to be glass lined.  The Corps noted that all valves had to be glass lined because they came into contact with wastewater.  (SMF ¶¶ 38-42 (citing R4, tabs 5-7))

4.  Therefore, First Street provided a new submittal for glass lined valves, regardless of the size of the valves (SMF ¶ 43 (citing R4, tab 4.6 at 20-21)).

5.  First Street subsequently submitted an REA seeking $35,802.76 in costs for the purported change of requiring that valves larger than three inches be glass lined (SMF ¶ 43 (citing R4, tab 4.6 at 20-21)).  The Corps did not respond formally to that REA (SMF ¶ 44).

6.  On June 20, 2024, First Street submitted a certified claim to the CO (R4, tab 10).  On September 16, 2024, the CO issued a COFD denying the claim (R4, tab 11).  This appeal followed.

II.    Glass Lined Valve Claim Decision

We deny the parties' cross-motions for summary judgment on the Glass Lined Valve Claim because there are genuine issues of material fact as to whether the Corps required First Street to perform work beyond the Contract's requirements when it insisted that valves larger than three inches be glass lined.  "In order to demonstrate a constructive change, a [contractor] must show that:  (1) it performed work beyond the contract requirements (Change Element); and (2) the government ordered, expressly or impliedly, the additional work (Order Element)."  *Thalle Constr. Co.*, ASBCA No. 63685 *et al.*, 25-1 BCA ¶ 38,892 at 189,310 (citing *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014)).  In determining what work a contract requires under the Change Element, we begin with the contract interpretation analysis discussed above in addressing the Concrete Floor Openings Claim.  *See, e.g., JAAAT Tech. Servs., LLC*, ASBCA No. 62373, 22-1 BCA ¶ 38,086 at 184,964; *Gen. Dynamics-Nat'l Steel and Shipbuilding*

13

*Co.*, ASBCA No. 61524, 22-1 BCA ¶ 38,067 at 184,823.

Furthermore, "[i]f a contract is ambiguous, we may resort to extrinsic evidence to determine the parties' intent." *Gen. Dynamics-Nat'l Steel and Shipbuilding Co.*, ASBCA No. 61524, 19-1 BCA ¶ 37,291 at 181,417 (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988)). "Such evidence typically consists of evidence regarding discussions and concurrent actions, the prior course of dealing between the parties, or custom and trade usage." *Id*. If we are unable to determine the parties' intent, we generally read the contract against the party that drafted the contract under the doctrine of *contra proferentem*. *R.L. Persons Constr., Inc.*, ASBCA No. 60121, 18-1 BCA ¶ 37,007, at 180,236 (citing *Turner Constr. Co., Inc. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004)). However, if the ambiguity is sufficiently apparent that there was a patent ambiguity, then the contractor must inquire as to the meaning of that contact provision. *Id*. The issue of whether extrinsic evidence establishes the parties' intent generally renders a dispute not amenable to summary judgment. *Sauer Constr., LLC*, ASBCA No. 63738, 25-1 BCA ¶ 38,744 at 188,345. "The issue of whether any ambiguity is patent or latent is a question of law that is appropriate for resolution on summary judgment." *R.L. Persons*, 18-1 BCA ¶ 37,007 at 180,237 (citing *NVT*, 370 F.3d at 1159).

Here, there is a genuine issue of material fact as to whether First Street performed work beyond the Contract's requirements when it used glass lined valves for valves larger than three inches because the Contract is ambiguous as to whether it required valves larger than three inches be glass lined, and neither party has met its burden of establishing the absence of any genuine issue of material fact as to whether extrinsic evidence establishes that the parties intended such a requirement. First, paragraph 2.8.5.1 is ambiguous as to whether valves larger than three inches had to be glass lined because it is susceptible to more than one reasonable interpretation. Paragraph 2.8.5.1 stated that:

> Nonlubricated type eccentric valves, 3 inch and smaller, shall be rated for 175 [pounds per square inch gauge] service at 140 degrees [Fahrenheit]. Valves shall be capabl [sic] of sealing in both directions at the rated pressure, and have an unobstructed flow path when open. <u>Valves shall have</u> . . . <u>glass lining</u> . . . . Greater Than 4 Inches: Worm gear manual operators with handwheel. Furnish chain wheel operators for valves mounted over 7 feet above operating floor. All connecting hardware shall be Type 316 stainless steel.

(Glass Lined Valve Claim SOF ¶ 1 (emphasis added)) On the one hand, a reasonably intelligent person could interpret Paragraph 2.8.5.1 as not limiting the glass lining requirement to valves of any particular size based upon the fact that the sentence containing the glass lining requirement did not include a limitation on the size of valves to which the

14

glass lining requirement applied—while other sentences with other requirements include such limitations on the valve size to which the requirements applied (*id*.). On the other hand, a reasonably intelligent person could infer that, when Paragraph 2.8.5.1 required that "[v]alves shall have . . . glass lining" in the third sentence, it still was referring to the three inch or smaller valves identified in the first sentence based upon the fact that neither the second or third sentences of Paragraph 2.8.5.1 indicated that Paragraph 2.8.5.1 was transitioning to a discussion of a different categories of valves than the three inch or smaller valves identified in the first sentence of Paragraph 2.8.5.1 (*id*.). For example, neither the second nor the third sentence indicated that Paragraph 2.8.5.1 henceforth was discussing "all" valves (*id*.). That interpretation is supported by the fact that Paragraph 2.8.5.1 subsequently did indicate a transition to discussing a different category of valves by expressly referring to valves "Greater Than 4 Inches" in the third-to-last sentence (*id*.).[7]

Second, neither party has met its burden of establishing the absence of any genuine issue of material fact as to whether extrinsic evidence establishes that the parties intended that valves larger than three inches be glass lined. *Gen. Dynamics-Nat'l Steel and Shipbuilding*, 19-1 BCA ¶ 37,291 at 181,417; *Beta Sys.*, 838 F.2d at 1183. In rejecting valves larger than three inches that were not glass lined, the Corps stated that those valves had to be glass lined because they came into contact with wastewater (Glass Lined Valve Claim SOF ¶ 3). However, neither party presents evidence as to whether, based upon discussions and concurrent actions, the prior course of dealing between the parties, or custom and trade usage, a reasonable contractor in First Street's position would have interpreted the Contract as requiring that all valves be glass lined because they came into contact with wastewater (gov't mot. at 26-27; app. reply at 13-16). Therefore, there is a genuine issue of material fact precluding us from granting summary judgment on the Glass Lined Valve Claim.

---

[7] Nor does Drawing Sheet M-5, to which the Corps points (gov't mot. at 27), resolve that ambiguity because, while the drawing required that pipes be glass lined, it did not mention glass lining for valves (Glass Lined Valve Claim SOF ¶ 2). The Corps also points to Specification § 01 11 00 ¶ 1.1.1.1, which required First Street to "[p]rovide and install new glass lined grit piping valves and all other process mechanical equipment shown on the Contract Drawings and Specifications, but not supplied by Smith and Loveless" (gov't reply at 10; *see also* Glass Lined Valve Claim SOF ¶ 1). However, that merely begs the question of what new glass lined grit piping valves the drawings and specifications showed. As discussed above, the Contract is ambiguous on that point.

# TEMPORARY GRIT PUMP WATCH SERVICES CLAIM

I.    Temporary Grit Pump Watch Services Claim SOF for Purposes of Deciding the Motions

1.    There were two sides to the girt dewatering system:  the East Grit System and the West Grit System (SMF ¶ 7).  The Gary Sanitary District typically operated the East and West Grit Systems independently from one another—with one side running while the other side was not running—because each has its own Grit Pump.  Both sides also could operate at the same time when the Gary Sanitary District needed extra capacity (SMF ¶ 7).

2.    The specifications required that the wastewater treatment plant operate continually (SMF ¶ 45 (citing R4, tab 2 at 140)).  The specifications also required that First Street only install one grit system at a time (R4, tab 2 at 146-48).  Specification § 01 35 13.53, ¶ 1.5(i) (Paragraph 1.5(i)), stated that:

> Flow to and through the treatment plant shall generally not be interrupted.  Flow through portions of the plant may only be shut- down to perform work as delineated herein.  All shut-downs shall occur only upon written request and with prior written authorization from the Owner.  Such authorizations will be limited to times when the hydraulic capacity of units remaining in service shall not be exceeded.  When work requires that a portion of the plant be shut down, the Contractor shall be fully prepared to execute the work in the most expeditious manner.  Plan the work by taking into consideration all potential problems that may be encountered.  Spare pumps, pipe and fittings, and all other equipment appropriate for the work to be done shall be readily available by the Contractor for use in an emergency under the Contractor's operation.  The Contractor shall be prepared to work continuously (24 hours per day, seven days per week) during the time when any units or pipelines are out of service that affect the treatment process.

(SMF ¶ 48 (citing R4, tab 2 at 144) (emphasis added))

3.    After First Street demolished the existing West and East Grit Systems and installed the new West and East Grit Systems (SMF ¶¶ 49-53), the new West Grit System experienced a failure of a volute—which is a spiral-shaped casing—on July 27, 2022.  That failure caused the newly installed Grit Pumps and the entire pump pit to

16

flood.  (SMF ¶ 54)

4.  Following the volute failure, First Street removed the flooded Grit Pumps to "bake"—or completely dry—them for use until First Street could acquire new Grit Pumps (SMF ¶¶ 56-59, 69-70, 72).

5.  In the meantime, First Street rented and connected a temporary grit pump (Temporary Grit Pump) (SMF ¶ 56 (citing app. supp. R4, tab 8, at 1-2)).[8]  The Temporary Grit Pump could operate either the East Grit System or the West Grit System. It had a diesel-powered motor located outside on the Detritor Building's loading bay and connected via a long hose to the Temporary Grit Pump.  (SMF ¶ 61)

6.  While the Gary Sanitary District cleaned the West Grit System, First Street would operate the Temporary Grit Pump as needed (SMF ¶ 63 (citing app. supp. R4, tab 4 at 1)).  On August 12, 2022, First Street wrote to the CO's representative (COR), requesting that the Corps permit First Street to operate the Temporary Grit Pump only during normal working hours (SMF ¶ 64 (citing app. supp. R4, tab 7 at 1)).

7.  That same day, the COR responded, directing First Street to continue providing continuous watch services over the Temporary Grit Pump (SMF ¶ 65 (citing app. supp. R4, tab 7 at 1)).

8.  While First Street informed the Corps that it viewed that directive as a change, it nevertheless complied by subcontracting for continuous Temporary Grit Pump watch services between August 14, 2022 and December 12, 2022 (SMF ¶ 66).

9.  On December 13, 2022, the Corps permitted First Street to replace the Temporary Grit Pump with the baked Grit Pumps (SMF ¶ 71).

10.  On October 30, 2023, First Street submitted an REA seeking the costs associated with the provision of continuous Temporary Grit Pump watch services between August 14, 2022 and December 12, 2022 (Relevant Period) (SMF ¶ 73 (citing R4, tab 4.6 at 28-29)).

---

[8] First Street installed the first temporary grit pump on July 27, 2022 (SMF ¶ 56).  It replaced that pump with a larger temporary grit pump on August 3, 2022 due to the excessive debris that entered the flooded pump pit through a damaged screen in the West Grit System (SMF ¶ 60).  All references to the Temporary Grit Pump are to the second temporary grit pump.

11.  On June 20, 2024, First Stret submitted a certified claim (SMF ¶ 74 (citing R4, tab 10, at 5)).  On September 16, 2024, the CO issued a COFD denying the claim (R4, tab 11).  This appeal followed.

II.     Temporary Grit Pump Watch Services Claim Decision

We deny the parties' cross-motions for summary judgment on the Temporary Grit Pump Watch Services Claim that the Corps constructively changed the Contract because there is a genuine issue of material fact as to whether First Street performed work beyond the Contract requirements when it provided continuous pump watch services during the Relevant Period.  It is undisputed that First Street provided continuous Temporary Grit Pump watch services during the Relevant Period (Temporary Grit Pump Watch Services Claim SOF ¶ 8).  Moreover, paragraph 1.5(i) unambiguously required First Street to "be prepared to work continuously (24 hours per day, seven days per week) during the time when any units or pipelines are out of service that affect the treatment process" (*id*. at ¶ 2 (emphasis added)).  Further, it is undisputed that the Grit Pumps were out of service during the Relevant Period (*id*. at ¶¶ 4, 9).  However, neither party has met its burden of establishing the absence of a genuine issue of material fact as to whether the Grit Pumps being out of service affected the treatment process.

The parties raise competing arguments as to whether the Grit Pumps being out of service affected the treatment process.  In particular, First Street argues that the Grit Pumps being out of service did not affect the treatment process because the parties always anticipated that the Gary Sanitary District would operate only one permanent Grit Pump during construction, First Street provided the Temporary Grit Pump, and using the single Temporary Grit Pump did not affect the treatment process differently than using a single permanent Grit Pump (app. mot. at 13, 26-27).  The Corps argues that using the Temporary Grit Pump—as opposed to a permanent Grit Pump—did affect the treatment process differently than the anticipated single permanent Grit Pump because the Temporary Grit Pump was more susceptible to failure than the permanent Grit Pump absent continuous Temporary Grit Pump watch service due to the fact that the Temporary Grit Pump required fuel upkeep, the motor was on the loading bay instead of in the pump room, and a long hose connected the motor to the grit system (gov't mot. at 28-29; gov't reply at 11-12).  First Street responds that it fueled the tanks during normal working hours and the tanks were large enough to run for two to three days without refueling (app. reply at 22).

However, neither party presents any evidence in support of its argument as to whether the Grit Pumps being out of service affected the treatment process during the Relevant Period by leaving the wastewater treatment plant reliant upon the Temporary Grit Pump, which was more susceptible to failure than a permanent Grit Pump absent continuous watch services (gov't mot. at 28-29; gov't reply at 11-12; app. reply at 22).

18

Thus, neither party has met its burden of establishing the absence of any genuine issue of material fact as to whether First Street performed work beyond the Contract's requirement that it work continuously during periods when a unit was out of service that affected the treatment process by providing continuous Temporary Grit Pump watch services during the Relevant Period. As a result, we deny the parties' cross-motions for summary judgment on the Temporary Grit Pump Watch Services Claim.

CONCLUSION

For the reasons discussed above, we deny the parties' cross-motions for summary judgment.

Dated: February 20, 2026

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

19

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 64028, Appeal of First Street Contractors, LLC, rendered in conformance with the Board's Charter.

Dated:  February 20, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals
